IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA and <br> THE STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> GEORGE A. WHITING PAPER COMPANY, *et al.* <br><br> Defendants. | Civil Action No. 09-cv-00692 <br><br> Hon. William C. Griesbach |

**PLAINTIFFS' JOINT BRIEF IN SUPPORT OF
MOTION TO ENTER CONSENT DECREE
WITH DEFENDANT CITY OF DE PERE**

On September 25, 2009, the United States of America and the State of Wisconsin (collectively the "Plaintiffs") lodged with the Court a proposed Consent Decree with defendant City of De Pere ("De Pere" or "Settling Defendant"), to resolve the Settling Defendant's liability for polychlorinated biphenyl ("PCB") contamination at the Lower Fox River and Green Bay Site (the "Site"). The proposed Consent Decree requires De Pere to make a payment of $210,000. On October 8, 2009, the United States published notice of the settlement in the Federal Register and solicited public comments in accordance with the governing law. See 74 Fed. Reg. 51,878 (Oct. 8, 2009). One joint set of comments was submitted by Appleton Papers Inc. ("API") and NCR Corporation ("NCR").[1]

---

[1] A complete copy of the API/NCR comment and its exhibits are included as Attachment 1 hereto.

The API/NCR comment is substantially similar to the arguments presented in *Intervenors Appleton Papers Inc. and NCR Corporation's Brief in Opposition to Motion to Enter Consent Decree with Eleven De Minimis Defendants* (Dkt. 38) and contains little new information specific to the City of De Pere. In its Order addressing the proposed consent decree with eleven *de minimis* party defendants ("First *De Minimis* Consent Decree"), this Court rejected the arguments raised by API/NCR and repeated here. See Decision and Order Approving Consent Decree (Dkt. 58) at 4-6. Thus, as with the First *De Minimis* Consent Decree, the proposed settlement here should be approved because it too is fair, reasonable, and consistent with the purposes of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675. The Plaintiffs have reviewed the comments and determined that nothing in the comments would justify withdrawal of their consent to the Consent Decree. The Plaintiffs request that the Court enter the proposed Consent Decree.

## I. BACKGROUND ON THE SITE AND THE CONSENT DECREE

### A. City of De Pere and the Lower Fox River and Green Bay Site

The history of the PCB contamination of the Lower Fox River and Plaintiffs' efforts to remediate such contamination and address the damages to natural resources related thereto were previously addressed in briefing on the First *De Minimis* Consent Decree and, therefore, will not be repeated here. See Plaintiffs' Joint Brief in Support of Motion to Enter Consent Decree with Eleven *De Minimis* Party Defendants (Dkt. 20) at 2-12; see also Appleton Papers Inc., et al. v. George A. Whiting Paper Co., et al., No. 08-C-16, slip op. at 5-8 (E.D. Wis. Dec. 16, 2009).

The City of De Pere publicly owned treatment works ("POTW") is located in Operable Unit ("OU") 4, approximately a half-mile below the De Pere Dam. The De Pere POTW was

originally constructed in 1937. Prior to 1970, no known significant user of PCBs discharged to the De Pere POTW.[2] In 1970, U.S. Paper Mills Corp. ("U.S. Paper") requested a connection to the De Pere sewerage system for treatment of its wastewater. U.S. Paper was a recipient of EPA's November 2007 Unilateral Administrative Order ("UAO"), requiring U.S. Paper among others to perform the required cleanup work in OUs 2-5.[3] In response to government information requests, U.S. Paper conceded that it likely used some broke and/or converter trim from the manufacturing of NCR carbonless copy paper (which contained PCBs) as a feedstock for its paper making operations. U.S. Paper's processes released PCBs contained in the NCR paper and the PCBs were then discharged in U.S. Paper's wastewater.

Although the connection between U.S. Paper and the De Pere sewers was initially completed in August 1970, U.S. Paper was required to disconnect from the system shortly thereafter because high suspended solids rates in its effluent were interfering with the POTW's operations. U.S. Paper began to recirculate its wastewater and put in place additional devices to remove solids from the water. In January 1971, U.S. Paper successfully reconnected to the De Pere sewer system. By mid-1971, NCR stopped using PCBs in the emulsion used to coat its

---

[2] For some time prior to 1966, the City had been leasing property adjacent to the Fox River from Milprint, Inc. (n/k/a International Paper - Nicollet Mill) for use as a city dump. The City's dumping of refuse along the shore line had resulted in material being deposited into the River and the U.S. Army Corps of Engineers required construction of a bulkhead to ensure that past and future dumping would not interfere with navigation. The City and Milprint entered into a lease, pursuant to which the City was allowed to deposit "trash (other than garbage), trees, brush, shrubs, earth, rocks, concrete, and other rubble" on the Milprint property. There is no indication that any material dumped by the City in or near the River would have contained PCBs.

[3] Additionally, in a 2006 Consent Decree, U.S. Paper (then known as Sonoco-U.S. Mills) and NCR committed to dredge and dispose of highly-contaminated sediment in the Phase 1 Project Area in OU-4, just below the De Pere dam. That work was performed in 2007 and 2008.

carbonless copy paper. Thus, the concentration of PCBs in U.S. Paper's wastewater is estimated to have been significantly reduced by mid-1971, mere months after their connection to De Pere's sewers. Additionally, as any PCBs in U.S. Paper's wastewater would have tended to favorably adhere to solids, the De Pere POTW's treatment processes (removal of suspended solids) would have removed a significant portion of any PCBs from treated waters prior to discharge to the Fox River.[4]

### B. Overview of the Proposed Consent Decree

Under the proposed Consent Decree, the Plaintiffs would settle with De Pere in exchange for its payment of $210,000. Pursuant to an Order entered on September 28, 2009, De Pere has already paid this sum into the Court Registry. The funds (and accrued interest) would be disbursed to the Plaintiffs upon entry of a further Order in connection with the Court's approval and entry of the Consent Decree.[5]

As stated in Paragraph I.S of the proposed Consent Decree, in negotiating this settlement, the Plaintiffs assumed that the total cleanup costs and natural resource damages for the Site

---

[4] Effluent from the City of De Pere's POTW had not been sampled for PCBs before 1972. Between 1972 and 1983, the De Pere effluent was sampled on at least 10 occasions. Although none of the samples indicated the presence of Aroclor 1242 (the PCB found in carbonless copy paper), certain samples contained small amounts of Aroclor 1254, a PCB associated with a variety of other industrial processes. Between 1973 and 1978, the De Pere POTW disposed of its treatment sludge in a privately owned lagoon (the "O'Keefe Lagoon"). In 1979, limited sampling conducted on the lagoon sludge found low levels of PCBs (less than 5 ppm).

[5] The proposed Decree's structure and format closely track the well-established terms of the United States' *Revised Model CERCLA Section 122(g)(4) De Minimis Contributor Consent Decree* (which is posted on the EPA Office of Enforcement and Compliance Assurance's website: http://www.epa.gov/compliance/resources/policies/cleanup/superfund/rev-demin-122g4-cvr-4att.pdf) and is substantially similar to the First *De Minimis* Consent Decree.

might approach $1.5 billion (which includes $1.25 billion for past and future cleanup activities and an additional $250 million for natural resource damages). The same Paragraph of the proposed Decree recites the Plaintiffs' determination that the Settling Defendant should bear no more than a 0.014% equitable share of the Site costs and damages. The $210,000 to be paid by De Pere is approximately 0.014% of $1.5 billion.

Consistent with the First *De Minimis* Consent Decree, here too the $210,000 payment was divided into separate amounts for response activities and natural resource damages in direct proportion to the settlement-based estimates for the two claims (*i.e.*, the response cost estimate comprises 83% of the $1.5 billion total amount and the natural resource damages estimate comprises the remaining 17%, so 83% of that settlement recovery was earmarked for response and 17% was earmarked for natural resource damages). Thus, of the $210,000 total amount to be paid by the Settling Defendant: (1) $174,300 would be deposited in a specially-established Superfund Special Account for the Fox River Site, to be retained and used to finance response actions at the Site; and (2) $35,700 would be deposited in another specially-established, Site-specific sub-account within the Department of the Interior's ("DOI") Natural Resource Damage Assessment and Restoration Fund, to be used for Trustee-selected natural resource restoration activities at or near the Site.

## II.  STANDARD OF REVIEW

The well-settled standard of review applied to a proposed government settlement under CERCLA is whether the settlement is fair (from both procedural and substantive standpoints), reasonable, and consistent with the statute's purposes. United States v. Davis, 261 F.3d 1, 23-28 (1st Cir. 2001); United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1424, 1426 (6th

-5-

Case 1:09-cv-00692-WCG   Filed 02/01/10   Page 5 of 17   Document 60

Cir. 1991); United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990); United States v. Fort James Operating Co., 313 F. Supp. 2d 902, 906 (E.D. Wis. 2004). As this Court noted in its *Decision and Order Approving Consent Decree*, the "standard of review [of such settlements] is deferential." Dkt. 58 at 2. See also Davis, 261 F.3d at 21; Cannons Eng'g, 899 F.2d at 84; Akzo Coatings, 949 F.2d at 1424; Fort James, 313 F. Supp.2d at 906-907.

That level of deference certainly is appropriate where, as here, the government seeks to streamline a complex, multi-party CERCLA case by settling with a subset of the responsible parties based on an equitable allocation of responsibility. As noted in the Davis case:

> The calculation of liability and the allocation of that responsibility is specially within the scope of the Agency's and parties' expertise. "As long as the data the [government] uses to apportion liability for purposes of a consent decree falls along the broad spectrum of plausible approximations, judicial intrusion is unwarranted . . . . Having selected a reasonable method of weighing comparative fault, the agency need not show that it is the best, or even the fairest, of all conceivable methods."

Davis, 261 F.3d at 24 (quoting Cannons Eng'g, 899 F.2d at 88). Accord Fort James, 313 F. Supp.2d at 907 ("The test is not whether this court would have fashioned the same remedy nor whether it is the best possible settlement.").

Finally, courts can and should approve a CERCLA settlement even if there is lingering uncertainty or basic disagreement about the settlers' exact contributions to the contamination, given the rough volumetric information that is typically available at many Superfund sites. In rejecting API and NCR's earlier argument that the First *De Minimis* Consent Decree was "premature" given uncertainty regarding the exact makeup of PCBs in the Fox River, this Court recognized that accepting such a view "would defeat the entire purpose of settlement and ignore years of precedent encouraging *early* settlements - even when all of the facts are not yet known."

-6-

Dkt. 58 at 6 (emphasis in original). See also United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1089 (1st Cir. 1994) (upholding allocation that was an "approximation 'roughly correlated with some acceptable measure of comparative fault'"); Cannons Eng'g, 899 F.2d at 88 ("As long as the data the EPA uses to apportion liability for purposes of a consent decree *falls along the broad spectrum of plausible approximations*, judicial intrusion is unwarranted" (emphasis added)).

### III. JUSTIFICATION FOR THE PROPOSED SETTLEMENT

The Plaintiffs believe that the proposed settlement is fair, reasonable, and consistent with the purposes of CERCLA. In short, the proposed Consent Decree would require the City of De Pere, a *de minimis* settler, to pay its full fair share of the total estimated response costs and natural resource damages associated with the contamination at the Site -- plus a premium to cover the risk of future cost overruns -- as summarized below.

#### A. The Total Costs and Damages

In negotiating the settlement, the Plaintiffs assumed that the total costs and damages for the Site as a whole might approach $1.5 billion, including $1.25 billion for response costs and $250 million for natural resource damages.[6] This Court has previously recognized that the $1.5 billion figure "seems to be (at this stage, at least) a fair outside estimate and includes a significant premium for uncertainties." Dkt. 58 at 3.

---

[6] The derivation of those figures is fully explained in *Plaintiffs' Joint Brief in Support of Motion to Enter Consent Decree with Eleven De Minimis Party Defendants*. Dkt. 20 at 18-20.

## B. The City of De Pere's Equitable Share of the Total Costs and Damages

The Plaintiffs reviewed and considered a significant collection of information in assessing De Pere's equitable share of the total costs and damages.

First, the Plaintiffs reviewed relevant documents produced in response to formal requests for information under CERCLA Section 104(e), 42 U.S.C. § 9604(e), that DOI issued to the City of De Pere, U.S. Paper, and many other parties in 1996, 1997, and 1998.[7] That complete document collection comprises several hundred thousand pages. Aside from a relatively small number of documents that were designated as containing confidential business information and sequestered, all of those documents have been maintained for years in a public reading room at the U.S. Fish and Wildlife Services' offices in Green Bay.[8] In 2008, the United States asked De Pere to supplement its prior response to DOI's information requests, as necessary, and to re-certify the completeness of its response. In November 2008, De Pere provided the recertification and a one-page supplemental response.

Second, the Plaintiffs considered prior estimates of historical PCB discharges to the River,[9] as well as more recent information bearing on the amount of PCBs that certain potentially responsible parties ("PRPs") might have discharged.

---

[7] U.S. Paper supplemented its response to the information requests in 2005 and 2007.

[8] Indices of those documents are posted on the U.S. Fish and Wildlife Services' Fox River website at http://www.fws.gov/midwest/FoxRiverNRDA/.

[9] For example, WDNR prepared a Technical Memorandum entitled *Compilation and Estimation of Historical Discharges of Total Suspended Solids and Polychlorinated Biphenyls from Lower Fox River Point Sources* in 1999. A copy of that report is posted on WDNR's Fox River website at: http://dnr.wi.gov/org/water/wm/foxriver/documents/modeldocs/tm2d.pdf.

Third, the Plaintiffs reviewed a large collection of deposition transcripts, written discovery responses, and documents produced in the contribution litigation pending before this Court, which includes depositions and written discovery taken of De Pere and U.S. Paper.[10]

Fourth, the United States wrote to the major PRPs in October 2008 and solicited information bearing on the liability or equitable share of the other parties in the contribution litigation that were not UAO recipients, including De Pere. No information was provided in response as to De Pere.

Utilizing that information, the Plaintiffs identified and considered several factors relevant to De Pere's approximate equitable share of the potential total costs and damages. That assessment included consideration of: (1) information about the amount of PCBs discharged by De Pere; (2) the toxicity of the hazardous substances discharged; (3) equitable factors unique to De Pere, including its geographic location and its status as a POTW; and (4) De Pere's status as an early settler. Those factors are discussed below.

### 1. The Amount of PCBs Discharged

The Plaintiffs examined the existing evidence of PCB releases by De Pere, as well as its historic operations and possible PCB usage by the POTW itself and the industrial users it served. Based on that review, the Plaintiffs concluded that the City of De Pere discharged only a very small fraction of the total PCBs released to the Fox River, between 30 and 90 kg of PCBs. If De Pere discharged 90 kg of PCBs, that would represent approximately 0.037% of the more than 230,000 kg of total estimated PCBs discharged to the Site. The Plaintiffs used this upper bound

---

[10] In response to API's discovery requests, De Pere made over 100 boxes of documents available for review and presented two witnesses who were deposed on a wide range of topics by API. See Decl. of Richard Yde (Attach. 2).

-9-

discharge volume estimate as their starting point for the proposed settlement with De Pere, and then made adjustments based on other equitable factors in order to derive a final equitable share, as described in Section III.B.3 below.

The proposed Consent Decree also includes an additional safety factor: it specifies that the United States can "reopen" the settlement if other information demonstrates that De Pere had actually discharged more than 100 kg of PCBs on its own.

### 2. The Toxicity of the Hazardous Substances Discharged by De Pere

PCBs are the dominant pollutant of concern at the Fox River Site, as confirmed by decades of study. The human health-based fish and wildlife consumption advisories for the Fox River and Green Bay are based solely on total PCB levels in the fish and wildlife. The cleanup levels specified by the Records of Decision issued by EPA and WDNR also are based solely on total PCB concentrations in sediment at the Site. Thus, the Plaintiffs focused mainly on De Pere's association with PCB discharges – as opposed to discharges of other hazardous substances – in assessing its equitable share of the total costs and damages for the Site.[11]

In negotiating this settlement, the Plaintiffs also saw little or no basis for distinguishing among different PCB types (such as different Aroclor mixtures), so the Plaintiffs made no such distinction in assessing the equitable share. This approach was likewise used in Plaintiffs' First *De Minimis* Consent Decree and subsequently approved by this Court. See Dkt. 58 at 4-6.

---

[11] Although the settlement negotiations focused mainly on PCBs, the Plaintiffs negotiated a special Consent Decree provision that reserves the Plaintiffs' rights regarding future cleanup efforts at the Site that might be required to address hazardous substances other than PCBs. See Consent Decree ¶ 16.b.

-10-

### 3. Equitable Considerations Relevant to the Settlement.

Any individual party's equitable share of the cost and damages at this Site may be heavily influenced by factors other than waste volume and toxicity, such as: (1) the party's discharge location, or any other reasons why the party may have more or less equitable responsibility for cleanup in certain portions of the River; (2) the strength of the evidence regarding the party's liability and equitable share; and (3) reasons why other PRPs should share partial equitable responsibility for any discharges by the party.

As noted above, the Plaintiffs determined that De Pere probably discharged between 30 and 90 kg of PCBs, which would represent as much as approximately 0.037% of the total PCBs discharged to the River. The Plaintiffs nonetheless decided that De Pere should not bear full equitable responsibility for a 0.037% volume-based share.

First, the Plaintiffs made an adjustment in De Pere's volume-based share due to geography. De Pere discharged in OU 4, below the De Pere dam, so it would have little or no equitable responsibility for contamination in upstream segments of the River, where some of the EPA-selected remedial work is being performed. At least 10% of the $1.5 billion in total costs and damages here are costs of cleanup work above the De Pere dam, so the Plaintiffs reduced De Pere's volume-based share by approximately 10% for that reason (*i.e.*, from 0.037% to about 0.033%).

Second, the Plaintiffs made an additional adjustment to De Pere's equitable share because other parties should bear significant equitable responsibility for De Pere's PCB discharges. The City of De Pere's POTW provides wastewater treatment and management services for industrial and municipal customers. It did not generate PCB wastes of its own and,

-11-

to the extent it received wastewater containing PCBs, its treatment process would have removed a significant portion of the PCBs before the water was discharged to the River. De Pere treated PCB-contaminated wastewater from U.S. Paper, as well as wastewater from other industrial dischargers. The Plaintiffs reduced De Pere's share by approximately another two-thirds for those reasons (*i.e.*, from about 0.033% to about 0.014%).

De Pere's $210,000 settlement payment under the revised Consent Decree would fully cover its 0.014% equitable share of the total costs and damages.

### 4. De Pere's Status as an Early Settler.

Pre-litigation settlements with the government are strongly favored under CERCLA. An initial settlement with one party may encourage favorable settlements with others. In addition, settlements invariably narrow the issues that might need to be litigated, and can help minimize or avoid certain costs and risks inherent to litigation. An early natural resource damages settlement may allow an earlier start on restoration than would be possible if the claim were litigated to judgment, and may thereby actually reduce the public's loss. For those reasons, it may be appropriate to offer relatively favorable terms to early settlers, and for late settlers and non-settlers to bear the risk that they might ultimately be responsible for an enhanced share of the total claim, given CERCLA's joint and several liability scheme.[12] The terms of the proposed Consent Decree are fair, reasonable, and consistent with CERCLA, given the statute's expressed preference for early *de minimis* settlements.

---

[12] See United States v. Charter Int'l Oil Co., 83 F.3d 510, 515 (1st Cir. 1996) ("[CERCLA's] statutory framework contemplates that [potentially responsible parties] who do not join in a first-round settlement will be left with the risk of bearing a disproportionate share of liability."); Cannons Eng'g, 899 F.2d at 91; Fort James, 313 F. Supp. 2d at 909 (quoting Charter Int'l Oil).

-12-

## IV. RESPONSE TO COMMENTS

The Plaintiffs received one joint set of comments from API and NCR on the proposed Consent Decree (Attach. 1). The comments are captioned as follows:

1. The investigation into De Pere's discharges of PCBs into the Lower Fox River has been inadequate to determine whether its PCB discharges were minimal.

2. Whether the toxic or other hazardous effects of the PCBs Discharged by De Pere to the Lower Fox River are minimal has not been established.

3. Whether De Pere's Share for the PCB Contamination is Divisible has not yet been established.

API/NCR's comments contain virtually nothing in the way of specific concerns regarding De Pere itself. Instead API/NCR repeat -- at some points apparently verbatim -- the same arguments they presented in their earlier Opposition to First *De Minimis* Consent Decree. See Dkt. 38. Each of these arguments was previously addressed by the Plaintiffs (Dkt. 55) and rejected by this Court in its *Decision and Order* (Dkt. 58).

Each of the three comments revolves around the concept that costs and damages for the extensive PCB contamination of the Lower Fox River should be apportioned to individual PCB formulations, such as Aroclor 1242 and Aroclor 1254, rather than addressed in terms of releases of *total* PCBs. As with the First *De Minimis* Consent Decree, here too Plaintiffs applied the total PCB standard. This policy was chosen due to the uncertainties inherent in efforts to distinguish between different PCB formulations once released into the environment, the co-location of different PCB formulations in sediments along the Lower Fox River, and the lack of notable differences in toxicity among the formulations.

-13-

In addressing these arguments when raised with regard to the First *De Minimis* Consent Decree, this Court stated that:

> [T]he more important takeaway is that this is the governments' case, and the governments are entitled, absent extraordinary circumstances, to determine how they want to measure the toxins they regulate.

Dkt. 58 at 6. This Court found that the use of a total PCB standard by Plaintiffs and settling defendants constituted a "reasoned settlement approach." Id.; see also Kalamazoo River Study Group v. Rockwell Int'l, 107 F. Supp. 2d 817, 836 (W.D. Mich. 2000), aff'd 274 F.3d 1043, 1051 (6th Cir. 2001) ("Court will follow the regulatory bodies, and will treat all PCBs on an equal basis"). As this Court concluded that API/NCR's arguments regarding the First *De Minimis* Consent Decree "do not overcome the settlement's presumption of validity and the deference owed to the reasoned decisions of sophisticated parties who are represented by counsel" (Dkt. 58 at 5), here too Plaintiffs determined that API/NCR's comments did not alter their conclusion that the proposed settlement is fair, reasonable, and consistent with CERCLA.

## V. THE DECREE IS FAIR, REASONABLE, AND CONSISTENT WITH CERCLA

After reviewing and considering the comments on the Consent Decree, the Plaintiffs have determined that the proposed settlement is fair, reasonable, and consistent with CERCLA. The settlement was negotiated at arms-length over months. The Consent Decree is well-justified in light of the settlement considerations discussed above. The settlement would reimburse an appropriate portion of certain CERCLA response costs and natural resource damage assessment costs incurred by the Plaintiffs and would facilitate important natural resource restoration work

-14-

in the Fox River/Green Bay area.  For those reasons, the Court should approve and enter the revised Consent Decree with the City of De Pere.

          Respectfully submitted,

          FOR THE UNITED STATES OF AMERICA

          IGNACIA S. MORENO
          Assistant Attorney General
          Environment and Natural Resources Division
          U.S. Department of Justice

            s/ Jeffrey A. Spector
          JEFFREY A. SPECTOR, Trial Attorney
          RANDALL M. STONE, Senior Attorney
          Environmental Enforcement Section
          Environment and Natural Resources Division
          United States Department of Justice
          P.O. Box 7611
          Washington, DC  20044
          (202) 514-4432

          MICHELLE L. JACOBS
          United States Attorney
          MATTHEW V. RICHMOND
          Assistant United States Attorney
          Eastern District of Wisconsin
          530 Federal Building
          517 East Wisconsin Avenue
          Milwaukee, WI  53202

OF COUNSEL:

Richard Murawski
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 West Jackson Blvd.
Chicago, IL  60604

Signature page for *Plaintiffs' Joint Brief in Support of Motion to Enter Consent Decree with Defendant City of De Pere* in <u>United States, et al. v. George Whiting Paper Co., et al.</u>, Case No. 09-cv-00692 (E.D. Wis.).

                FOR THE STATE OF WISCONSIN

                  s/ Cynthia Hirsch
                CYNTHIA HIRSCH
                Assistant Attorney General
                Wisconsin Department of Justice
                17 West Main Street
                Madison, WI  53702
                (608) 266-3861

-16-

**CERTIFICATE OF SERVICE**

   I hereby certify that copies of the foregoing *Plaintiffs' Joint Brief in Support of Motion to Enter Consent Decree With Defendant City of De Pere* were served on this date served via the Court's ECF filing system on all counsel of record in this matter and by first-class mail, postage prepaid, upon the following individuals:

| | |
|---|---|
| Philip A. Munroe<br>DiRenzo & Bomier LLC<br>Two Neenah Center, Suite 701<br>PO Box 788<br>Neenah, WI 54957-0788 | Joseph C. Basta<br>DYKEMA GOSSETT PLLC<br>2723 South State Street<br>Suite 400<br>Ann Arbor, MI 48104 |
| John F. Cermack, Jr.<br>Sonja A. Inglin<br>BAKER & HOSTETLER LLP<br>12100 Wilshire Boulevard, 15th Floor<br>Los Angeles, CA 90025 | David A. Crass<br>MICHAEL BEST & FRIEDRICH LLP<br>Firstar Plaza<br>1 S Pinckney St. - Ste 700<br>PO Box 1806<br>Madison, WI 53701-1806 |
| Timothy B. Anderson<br>REMLEY & SENSENBRENNER, S.C.<br>219 E. Wisconsin Avenue<br>Neenah, WI 54956 | Ted A Warpinski<br>FRIEBERT FINERTY & ST JOHN SC<br>2 Plaza East<br>330 E Kilbourn Ave. - Ste 1250<br>Milwaukee, WI 53202-3158 |

   2/1/10               s/ Jeffrey A. Spector
    Date                 Jeffrey A. Spector